We have just one case on this morning's docket. It's cause number 21-40166 by a heartbeat. He gang pain. Is the appellant ready to proceed? Appellee ready to proceed. All right, appellant. May it please the court. Good morning, Your Honor. You can take your mask off. Oh, can I? May it please the court. Good morning, Your Honors. My name is He Chen, and I represent three appellants. All right, you're going to need to keep your voice up, please. I assume He GangPeng and Che HaiXia in this appeal, and I'd like to reserve five minutes for rebuttal. All right, noted. This is a trademark infringement case against numerous domestic and international e-commerce merchants across different online platforms, such as Amazon. I've got very old ears. You're going to have to speak louder. Such as Amazon, eBay, Alibaba, and Wish. Those are online platforms for selling merchants. I'd like to focus on two of the legal issues that are presented in this case. First is whether or not the Hague Service Convention procedure should be followed in this case, and that is the Convention on the Service Abroad of Judicial and Extraditional Documents in Civil or Commercial Matters. Let me ask you, right, the relief you're seeking is that we set aside the default judgment? Yes, Your Honor. Did you move in the lower court to set aside the default judgment? We did not. Is there a reason you didn't do that? We feel that this type of litigation has become more and more prevalent in this country, and we feel that a clear decision from the circuit court may shed light to the district courts whether or not the service process should be followed under the Hague Evidence Convention for international defendants. But there's nothing that would have prevented an appeal of a denial of the motion to set aside the default judgment in district court. Is that right? I mean, if you had filed a motion to set aside the default judgment in the district court, and the district court denied that motion, you would have been able to appeal that, wouldn't you? Still would be. No? I'm asking you. Yes. Wouldn't you be able to appeal that? Yes, of course. All right. So you just wanted to get here faster. Yes. And in doing that, you deny the district court an opportunity to hear all these arguments you have as to why it should not have entered the default judgment. That's the result. Go ahead. Your Honor. Yes. So after the e-commerce merchants were joined together procedurally, the biggest hurdle is to serve each one of the defendants properly, international defendants and domestic defendants. And there are different rules governing serving international defendants, which is a Hague Convention procedure. You've made an argument that this should have been misjoined, that the case was misjoined. Yes. Is that correct? Yes, Your Honor. I assume you would concede that if they could prove that all the defendants were essentially one entity or were working together, I assume you'd agree they could proceed joined in that setting. Your point is that these entities have nothing to do with each other? If they are proven to be an interrelated group of counterfeiters, then yes, that would destroy the misjoiner arguments. But does that answer your question? Right. So your point is that they haven't proven. They haven't proven, no. But they've alleged it. They did, without sufficient facts supporting their allegation. Okay. Did you all ask for misjoinder in the district court? No. Were you aware of the pending proceedings? I realize you represent only three of the defendants, but I know that there were these e-mails sent to your clients. Were those the correct e-mails? That's one of the arguments that I'm going to make. And according to the three defendants that I represent, the e-mails went to the junk box, so they never received proper service in this case. They went to the junk box. Okay. But those were your e-mail addresses. They were. But those were the correct e-mail addresses? They were, yes. The computer screwed up. Yes, yes. But the plaintiffs sent it to the right e-mail address. They did. I'm sorry. No, I wanted to hear the answer, too. Was that the correct e-mail address? That was the correct e-mail address. And that correct e-mail address came from your clients. They provided that e-mail address. They were provided to the online platforms, and then I think through Discovery, the online platform provided those e-mail addresses to the plaintiff appellee. And those were e-mail addresses? Were e-mail addresses to be used by anybody, any consumer, any customer, anybody who wanted to communicate with your clients? Could use that e-mail address? I don't think that's publicly disclosed. I think that e-mail address is used for registration purpose. I don't know if that e-mail address was displayed on those online platforms. You don't know, so you can't say whether it was or was not the one that was available for the public to use? I do not know. All right. But if I may go back to the jointer point. Of course. You say that there's no evidence that the parties worked together, but wasn't the district court permitted to assume that you guys worked together? When I say you guys, you mean not just your clients but all the defendants. Why can't the district court assume that they were working in concert as an interrelated group? I mean, the district court does have discretion in deciding this issue, but the thing is with improper service. Actually, does the district court even have the discretion? It's been pled, and it's not been disputed. I'm looking at paragraph 6 of the complaint. That is because no one raised the issue, and the reason that no defendants came up with the argument is because a lot of them were not properly served. And without proper service, they were deprived a day in court, and they cannot raise that issue if the service wasn't effectuated properly. Understood. But you're saying that this was an abuse of discretion by the district court? Yes. I'm not talking about service. We can have a discussion about service. But I'm talking about this theory that the district court abused its discretion in not severing these cases when, from what I can tell, they had no choice but to accept the plaintiff's theory because they had nothing else to go on, and obviously plaintiffs didn't have a chance to do discovery. But there were alleged infringing evidence provided to the district court, and an examination of those alleged infringing evidence can prove that there were different defendants selling different products with different product descriptions with different images. But I thought I heard you disagree that if, in fact, the parties, all the defendants were working together, then you couldn't misjoin, that this is a validly joined case. That's right. And so my point is, why is this not a frivolous argument, given that the district court has nothing to go on other than the pleading? But there's a clear error committed by the district court. If the evidence provided by plaintiff shows clearly that — Well, that's a big if. I mean, at this point, there is no evidence. Plaintiffs haven't had the chance to do discovery. All there is is their pleading. Oh, there were infringing evidence provided with the complaint. Was there any evidence in the record that the defendants did not work together? They did not work together. It's proving negative, I realize, but — Right, right, right, right. They did not work together. If you're the district court, what choice do you have? It's been pled that they worked together. Nobody's even denied it. For all the district court would know, you would stipulate that you worked together. It's just that it's totally legal. Well, but the district court can act on its own discretion in deciding whether or not the evidence was supporting the claim. But the evidence provided by plaintiff simply do not support the claim, that the or — The pleading. We're at the pleading stage. I assume you'd agree this case never proceeded to discovery. No. I mean, as far as I know, that no one — Did any defendant participate in the case? Not those three defendants. I don't know about the other — Pardon my ignorance. Did any of the other defendants, not your clients? There were other defendants involved after the default judgment was entered. I don't know if there was any discovery ongoing with other defendants. OK, but you are here asking us to find that the district court abused its discretion. It sounds like you're saying that based on no evidence presented by any defendant to counter paragraph 6 of the complaint. Not by defendants, but by plaintiff itself. And the district court — By plaintiffs, it's — So, by — You're saying the plaintiffs had evidence that they weren't working in concert? Yes. What was that evidence? The evidence that the different defendants were selling different products. And there's no common questioning law — There's no question or law of facts common to all the defendants if they are selling different products, and the alleged infringement of trademarks was — When you say that they were selling different products, you mean just like literally they weren't manufactured by the same entity? No, it's not — But they were allegedly counterfeiting the same products, right, these two toys? That's right, the alleged counterfeiting. But the product itself doesn't look identical. I mean, some have cut in certain parts, so — Why does that prove that they weren't working together, or indeed that they weren't the same entity? If they are working together, then they have to have — There are companies that produce different products, obviously. The alleged infringement is on the trademark, and some of them don't even use the trademark in their product description. So, for example, one of the allegations is that the mark Brain Flakes was infringed. But some of the alleged infringing evidence provided by Plaintiff, they're simply — The seller were not even using Brain Flakes as their product description. They used Snow Flakes, or they simply used Brain Flakes as a descriptive term on their different brand names. And if people are selling similar products on the different brand names, assume they are different brand names. So, assuming they are not acting in concert or participation with each other. May I proceed? So, back to the service issue. So, the Fifth Circuit has consistently held that the procedure on the Hague Evidence Convention must be followed if serving international defendants, if the address to the defendants are known to Plaintiff. And the District Court, in this case, has recognized that Plaintiffs should diligently attempt to locate defendants' physical addresses and execute service on defendants in compliance with the Hague Evidence Convention procedure. And the District Court was correct in rejecting Plaintiff's first attempt to serve by email on May 15, 2019. And so, what changed from May 15, 2019 to June 17, 2020, when the District Court granted Plaintiff's motion to serve — motion for service by email? Veilhardt attempted to verify those addresses that it obtained from those online platforms by sending out FedEx notices to those addresses. And later, Veilhardt claimed that those actual physical addresses of the four defendants are unknown. And Veilhardt misled the District Court by claiming that none of the service or contact attempts were successful because the physical addresses were false. This is not true. By their own admission, according to the FedEx delivery status, there were FedEx mails that were delivered, there were FedEx mails that were refused, and there were FedEx mails that were marked as incorrect addresses for different reasons. So, those that were delivered and those that were refused assume — well, they can be delivered or they can be rejected by the person who is supposed to receive the mail. At least that means those are deliverable addresses. And if the address is deliverable, then they cannot claim the address is unknown to them. And if the address is known to Plaintiff, then — Did Mr. — I'm sorry, He Gangpeng, he gave an address to Amazon. I'm sorry, I assume it's a he, but I don't know. Is it true that the address that person provided to Amazon is this Red Oak, Texas address? That's true according to the information provided by the — Has this person ever resided in Red Oak, Texas? That I don't know. And, Your Honor, I see my time is coming up. May I finish my argument? You may. Thank you. Well, I don't know how long that is. You may use up the rest of your time. You've got 12 seconds. I have 12 seconds. Go ahead. So by Plaintiff's own admission that half of their FedEx mail were deliverable at least. So half of the address that they used that they tried to deliver those mail to were deliverable addresses. And if the address are deliverable, they are known to Plaintiff for the procedures under the Hague Service Convention should be followed. And based on that, I — based on that, the entry of default should be reversed, and Plaintiff should have defendants should — appellants should have their day in court and bring to present their argument on the subject matter of the trademark infringement. And so what would you say if — and I don't know how this is going to come out. What would you say if there was an order of remand for a hearing on all these claims you're making about what was known, what wasn't known, who resided where, and who didn't live where? Because it sounds like you need a hearing in a district court, which is the place where evidentiary hearings typically occur, yet you're standing here. What would you say to a remand for that? To remand for . . . An evidentiary hearing on all these claims and defenses and all these other things you . . . By trial court. Yes, Your Honor. And the reason they were not heard by the trial court is because the motion for alternative service was granted and service was done by email in this case. And with improper service, some of the defendants were not served properly and they never got a chance to read their argument in the district court before the default judgment was entered.  It seems to me that that is what you would like because just one judge, it seems to me that all that you or your clients are seeking is to delay, delay, delay. And meanwhile, the infringement can't be heard from a standpoint of the merits. The merit can still be decided. I mean, if irreparable harm can be proven for a plaintiff, if they can show a strong likelihood of winning on the merit, they can apply for a temporary restraining order and they can apply for a preliminary injunction order. So that will allow the district court to decide on the merit before the procedure issue can be decided. And granting the temporary restraining order does not require . . . well, it does. Service does not . . . It does require service. It does require service. First, you've got to find it. Exactly. I don't want to be found. And I think this is the nature of international litigation. If you are suing foreign defendants, the . . . Is your client willing to waive service if we remand it? The . . . I don't know. I have to communicate with the defendants. We should not assume . . . for all we know, if it gets remanded, you're going to continue to protest service. But the service can proceed under the Hague Evidence Convention . . . Service Convention. If they can be found. If they can be found. I'm just trying to understand your position. Of course . . . Basically, if it goes back, there's going to be continued litigation over whether you've been properly served. That's true, but the oral procedure governing how a foreign defendant can be serviced . . . And then that will be appealed. Excuse me? Whatever the ruling is will be appealed. So it goes on forever. You mean for the service decided by the district court? If we remand it and the district court rules eventually, as it must, that will be appealed. But the district court decision on service is not immediately appealable. So, the case has to proceed and the service can eventually be appealed again after the case is decided. Well, the Hague Service Convention doesn't apply when the address is unknown. That's right. So, what we've got is a foreign defendant and Federal Rule of Civil Procedure 4F2 applies to that. And we have a domestic defendant and 4E1 applies to that to use the Texas law 106B. So, this thing ought to go ahead. So, the Hague Service Convention only applies to international defendants. And on the 4E, the district court can decide whether or not service by e-mail can proceed under state law. Have your client answered? Why don't we just decide it instead of sending it back to the district court and prolonging this ad infinitum? Meanwhile, your clients continue to do what the other side is complaining about, patent infringement. Trademark infringement. Yeah, trademark. So, the whole point is because of the improper service, defendants never get a chance to argue why their products do not . . . If you're so excited about this chance to defend, you waive service. You'll get your day in court. Can we do that?  Sure. Thank you, counsel. Thank you, Your Honor. Good morning. Mr. Wallace. May it please the court. E-mail service is not prohibited by international agreement, including the Hague Convention. And, in fact, it is the most efficient and reliable means of reaching foreign defendants who conduct infringing activities via online storefronts. This court has found that e-mail service is not prohibited by international agreement, is within the district court's sound discretion to authorize, and comports with due process clause. E-mail service is also . . . it reduces the significant burden that plaintiffs are facing in addressing the plague of foreign infringement on American intellectual property. Now, to serve any defendant, a plaintiff must first look to the Federal Rules of Civil Procedure, which grants district courts broad discretion under Rule 4F3 to order alternative service by any means not prohibited by international agreement. Now, foreign defendants who set up online storefronts to peddle infringing merchandise, oftentimes using U.S.-based platforms like Amazon and eBay, they commonly use pseudonyms and fake addresses, if they provide any address at all, to avoid service by traditional means. However, they must first provide an e-mail address. And this e-mail address is verified by the marketplaces. This e-mail address is used to sign in. It's used to conduct business. It's used to communicate with all of the customers and with others. And it's used to actually send and receive money. They must use these e-mail addresses. And as Appellant's Counsel just said, all of these e-mail addresses are correct. They were correct. This court and courts within this circuit have found that alternative service via e-mail is not only permitted by the Federal Rules of Civil Procedure, but it's preferable. For it's the most reliable and, in many cases, it's the only way that you can actually reach many of these defendants and properly and efficiently notice these would-be infringers that there's a lawsuit filed against them. And the Hague Convention is no obstacle to service via e-mail on foreign defendants operating online storefronts. And, in fact, in Niagara Vision v. Gotek, this very court found that e-mail service, court-ordered e-mail service at the district level, is not prohibited by international agreement. And, in fact, service under Rule 4F3 is proper and not prohibited. Now, this is because Article 10 of the Hague Convention preserves the ability of parties to effect service through specifically postal channels and through judicial officers as long as the recipient nation has not objected to these means of service. In signing the convention, China expressly rejected Article 10. In so doing, it expressly rejected service through postal channels and through judicial officers. China did not object to service by electronic means. In short, an objection to Article 10 is not an objection to electronic service, including service by e-mail. Because service by e-mail is not prohibited by international agreement, district courts are free to exercise their very, very broad discretion under Rule 4F3, which the district court did in this case, to order alternative means of service on foreign defendants via electronic means. And as this court has previously held, the Hague Convention does not displace Rule 4F3. It's merely one of the many means that a plaintiff may serve a foreign defendant. Now, service via e-mail comports with the Due Process Clause as well, as this court has previously found, because foreign defendants who operate online infringing storefronts conduct business exclusively and extensively through their online stores and correspond with customers via e-mail. Again, like appellants have conceded, those e-mail addresses are valid. They are accurate. That is a very valid and, in fact, the best and most preferable means to reach these defendants. Because these e-mail addresses must be valid to even commit the infringing acts in the first place, to set up the infringing stores, to actually sell these products, to communicate, to send and receive money, e-mail service is the best and oftentimes the only way to actually apprise these defendants that there's a lawsuit filed against them. Do you know how defendants – I'm sorry, these particular appellants, how they even found out about the default judgment? Because they said that the original e-mail went into a junk mail. How did they find out that the district court entered judgment, default judgment? There were many ways in this particular instance, Your Honor. We did try and serve the defendants that we could with physical e-mail addresses that appeared to be actual physical e-mail addresses via FedEx. We did get some bounce back. We got – I guess what I'm wondering is why are we even here in this appeal? The appellants obviously found out, these three particular entities found out about the default judgment. Do you know how they found out about it? They found out about the default judgment because they were noticed via e-mail, Your Honor. So e-mail – Through these same e-mail addresses. Through these e-mail addresses, through e-mail addresses to any counsel who may have made themselves known. This is just – They didn't have counsel. These three appellants did not have counsel, right? These three appellants. Correct, Your Honor. They were noticed of this lawsuit through e-mail, Your Honor. Through the e-mail addresses that were received through subpoena of the marketplaces like Amazon, eBay. So your theory is they got notice of the judgment, the default judgment at these e-mail addresses, but they say they didn't get notice of service because that went to junk mail? It is – It's our understanding because we do not monitor appellants' e-mail addresses. It's our understanding that the appellants were noticed of every step of this lawsuit through these e-mail addresses because they were apprised of the pendency of this lawsuit before the default judgment was entered, before the entry of default was entered, before any of the other motions filed in this matter were entered. They were noticed of these proceedings as soon as the e-mail addresses were received by the original plaintiff, the appellee, in the underlying case when that information was subpoenaed from the marketplaces. Can I switch to the joinder issue? Absolutely. Could the district court have sua sponte found misjoinder of these defendants? Yes, Your Honor. The district court could have. However, the Fifth Circuit – This particular – I don't mean theoretically. I mean given what the district court had in this case. Oh, given what the district court actually had before it, it could have, but it wouldn't have been proper, Your Honor, because all of the information – It couldn't have. It shouldn't have. It shouldn't have. Absolutely not. Not because of paragraph 6? Exactly, Your Honor. What evidence was there, if any, perhaps there was none, in the trial before the district court on this issue of working in concert? What the plaintiff was seeing is that all of these defendants were selling these same counterfeit products, these products that were touted as Brain Flakes. They were branded as Brain Flakes products, which as we know is the registered trademark of appellee, which was registered in 2016. This mark has been registered for five years now. It is a very, very popular product. Many, many sales worldwide, and apparently some of those sales made its way to China and to other foreign jurisdictions where these products were very easily copied and counterfeited. So here, because we were seeing the same products bearing the same mark being sold at the same time, supposedly within the exact same area, then this does – these series of transactions or occurrences do satisfy the Fifth Circuit's logically related test, which it has adopted as espoused in Mosley v. General Motors. Was there any evidence before the district court tending to disprove Paragraph 6, that they weren't working together? There was nothing before the district court, Your Honor. The defendants did not show up. They did not defend the lawsuit. They didn't bring any evidence whatsoever to prove that there was not some sort of series of transactions or occurrences or that the defendants were interrelated in some way. In fact, all of the facts pretty clearly show that these defendants were all acting in concert. And in these sorts of situations— Pardon my ignorance. There were 54 different defendants? Yes, Your Honor. Did any of them appear in the case? No, Your Honor. So all 54 you were not able to serve? None of them waved? None of them showed up? Plaintiff filed the motion for default judgment, and it was not— Okay. Maybe I misheard. I thought opposing counsel was saying that some of the other defendants had shown up, but okay. The motion for default judgment was not contested at all. So it applied to all 54? Plaintiff, yes, Your Honor. You were defaulting against all 54 because none of them had been served? Yes, Your Honor. You tried, I understand, but none of them had shown up to contest the case? That's right, Your Honor. Plaintiff was alone at the hearing on motion for default judgment, which was properly entered by the district court for the reasons stated. I want to quote something from page 20 of the blue brief. It accuses your client of—let's see. It is against public interest to allow an appellee, your client, to take advantage of the judicial system for personal gain. I want to give you a chance to respond. Absolutely. So there is no taking advantage of the judicial system for financial gain at all, Your Honor. In fact, the defendants are taking advantage of American consumers and American business people because here they're not able to create their products and sell their products without the fear that there is going to be some sort of foreign infringement. And so here Plaintiff actually properly brought this lawsuit against all of these defendants because these defendants were properly joined. There was a series of transactions or occurrences that led to Plaintiff bringing this lawsuit. And there's a question—there's a common question of law, common among all of these defendants as well, whether Plaintiff's trademark was violated. And the question is unequivocally yes. Here we have counterfeit products that look exactly like Plaintiff's products using actually Plaintiff's images and images of Plaintiff's actual products to sell this infringing merchandise. And so here they were properly joined. I think the district court—the district court properly did not sever these defendants from the underlying lawsuit. And moreover, the district court properly granted alternative service via email, which it was able to do under Rule 4F3 because email service is not precluded by international agreement in any way. So therefore Plaintiff, appellee, did not abuse the judicial system by any means. In fact, Plaintiff is only enforcing its own rights because its product, its trademark, its very valuable intellectual property, was being used and abused by these pseudo-anonymous entities abroad who felt that they could evade service, who felt that they could avoid default judgment, who could ignore a default judgment, disappear, potentially set up new infringing web stores. And here we are—here we are appealing. Would it be part of your response that it was the other side that was abusing the judicial system? I believe the other side was abusing the judicial system for sure. They were abusing many, many years of American jurisprudence. They were not honoring this court. They were not respecting the judicial system in any manner. And they in no way had any intention to actually come and bring the facts before the court. We believe, because they knew that they would lose, because this was a clear infringement, that there was clear trademark infringement, that it was clearly intentional as well. So yes, Judge Wiener, yes, for sure they were abusing the judicial system. And for all of these reasons, we do believe that the district court correctly found that email service was appropriate in this case, and we're asking this court to follow its own precedent and rule that email service is not prohibited by international agreement by any means and that district courts do have broad authority to order email service pursuant to Rule 4F3. And, in fact, any international service or any other means of service is not required before actually attempting email service. In fact, it's not even commonplace for a plaintiff located in the United States to be required to effect service of process on a foreign defendant in compliance with the Hague Convention or any international agreement. Courts in this district have found that. Courts have frequently cited delays of service under the Hague Convention and also avoiding additional expense in trying to serve a defendant in a foreign company to also be reasons to go ahead and order that alternative service rather than making a plaintiff go through the months and months and potentially years trying to wait and see if maybe a country's central authority will in fact serve its citizens. Because in many instances that does happen, and in most instances the central authority is never able to even find those defendants at all because, as we've stated, those defendants aren't really physical entities. They're online entities. They create an online presence at which they prefer to communicate with consumers and with others who are interested in their infringing products. Therefore, email is really the only and seriously the best means of reaching these defendants in compliance with the Due Process Clause, in compliance with the Federal Rules of Civil Procedure, and in line with precedent. And so also just hitting on another minor topic, there's policy and finality of judgments. If the court were to sever the parties and direct the district court to take this case back up now that the appellants have actually chosen to show up and defend the lawsuit, this would send a bad message to foreign defendants, and it basically will mean we don't have to show up. We don't have to appear. We don't have to defend a lawsuit in the district court because we can always appeal it. We can always show up later on. We can have the plaintiffs show all of their cards. We can show up on appeal. We can say here we are now. We are ready to actually defend this lawsuit, and then it will be brought down. And so that will set bad precedent. It will undermine default judgments, and it will prevent plaintiffs from enjoying finality in cases. And so for all of these reasons. What would you have this court do? I would have this court agree with its previous decision that email service is not prohibited by international agreement, including the Hague Convention, is in compliance with the Due Process Clause, and is the means most reasonably calculated and the most efficient and most reliable means to actually apprise defendants that are operating internationally. Where would this put the case? Back in district court or in Texas court or where? If this case were to be remanded? Yes. No. What would you have us do? I would have this circuit, the Fifth Circuit, follow its own precedent and rule that here, within this circuit. I want us to affirm the lower court. Yes, Your Honor. Yes, Your Honor. Yes. Affirm that email service is not prohibited. And it keeps going. Yes, sir. Yes, Your Honor. And just affirm that email service is not prohibited by international agreement. And this will give plaintiffs an actual means of meaningfully protecting and enforcing their intellectual property, rather than some of these smaller plaintiffs, who happen to have a successful and popular item, it will actually entice them to enforce their intellectual property otherwise. Counsel, I'm not sure if you heard Judge Wetus follow up. He said, and then it keeps going, referring to the case. If we affirm, this case is done, isn't it? That's correct, Your Honor. There is finality. There is a respect to the judicial process and the judicial system. And it won't send that message to international defendants that we can wait, we can sit on our hands, let plaintiffs show all of their cards, and then show up on appeal and continue to delay, delay, delay. Because in that instance, sometimes plaintiffs won't be able to continue to prosecute these sorts of lawsuits because in many instances there's no reason for us to remand. There's no reason at all, Your Honor. The appellants did not show up at all at the district court. Appellants' counsel said that these e-mail addresses were all valid. All of these e-mail addresses were e-mailed on multiple occasions of the various proceedings throughout the process, and they didn't show up. They didn't show up at the motion for default judgment. Meanwhile, the bogus items were being sold. While the bogus items were being sold and while funds were being drained from these accounts to frustrate plaintiffs' eventual judgment. That's why it is so, so important that we affirm the district court's decision and, moreover, also rule specifically that e-mail service is not prohibited by international agreement and is in compliance with the Due Process Clause, which will give plaintiffs a means of meaningfully enforcing their IP in the future and which will prevent these sorts of defendants from being noticed of a lawsuit, draining their funds, closing their stores, and disappearing. Just out of curiosity on that point, are you expecting, hypothetically, in the case of affirmance, are you expecting to be able to enforce the money judgment, or is this just about taking down from websites? This is about enforcing our client's intellectual property, Your Honor. The money is certainly very helpful because these lawsuits are very, very expensive, and plaintiff does feel like there is a financial strain in enforcing judgment. Are you expecting to be able to get the money, or is this just telling Amazon, I have a judgment, please remove these products from your website? It's about both sending message and the money, Your Honor. I wouldn't necessarily put one over the other. There is, like I said, a financial strain, but I think, more importantly, this is about the policy question. Are these products still on the web right now, then? Was the default judgment enough? We don't think that they're there. In fact, Your Honor, in many instances, as soon as a lawsuit is filed, these defendants close up shop, they withdraw their money, and they're nowhere to be found. In these sorts of situations, in an overwhelming majority of the defendants, you can expect for them to be nowhere to be found, for their online stores to be closed, for their accounts to also be drained. Therefore, that's why we're asking you here today respectfully to uphold this circuit's previous findings, that e-mail service is not prohibited by international agreement. Perhaps you could educate me. A website like Amazon only requires an e-mail address for their vendors? When it comes to actually verifying the address itself, verifying the web store, they only need to verify the e-mail address. There is no verification procedures for the physical address. Amazon doesn't confirm that it's a legitimate business at all? There's no confirmation that there's a physical address. A legitimate business is more of a nebulous term, so it's difficult to say whether— I'm not trying to suggest anybody's legit or not. I'm just asking hypothetically. Sure, sure. And so it's difficult to say whether Amazon actually vets its stores. It's very, very unlikely that they would do that. In these sorts of situations, because defendants are so fly by night, they create these stores, they shut down these stores, they create new stores, sometimes even with the same name, just to have a different Amazon vendor number. It becomes very, very confusing, and realistically that would not be a valid way for Amazon to actually operate, to spend a lot of its resources in vetting these stores and making sure that— Sounds like it's a topic for Congress maybe, but not for us. Sure, it's a topic for Congress, but also it's something for plaintiffs to police, and plaintiffs won't police it if this court is unwilling to agree that email service is prohibited by international agreement, because many plaintiffs won't be able to bring these sorts of lawsuits if they're not able to find these defendants, if these defendants simply disappear. Also, if plaintiffs are forced to file separate lawsuits against a multitude of different defendants, it becomes unduly prohibitive and costly because plaintiffs aren't able to bring that many lawsuits, and especially if we're in various different jurisdictions or many of the exact same lawsuit with maybe just some different facts thrown in for different defendants, that would be unduly prohibitive, and we would come out with different decisions in all these various lawsuits as well, and that would frustrate the judicial system too, because plaintiffs wouldn't be able to cite to applicable authority because there would be conflicting views, because different judges come to different views. So here we're respectfully asking that this court find email service is not prohibited by international agreement, it is in compliance with the Due Process Clause, and a district court has broad discretion under Rule 4F3 to allow email service on foreign defendants without the plaintiff having to try and affect international service, including service through the Hague Convention, first. Thank you, counsel. Your time has expired. Thank you. Provado. Thanks, Your Honors. I'd like to quickly address two points. The first is this case is not foreign defendants versus U.S. IP holders. Let's don't forget there are domestic defendants involved in this case. So to that point, we shouldn't really draw a line between domestic defendants and international defendants, just because the— You're referring to some of the defendants other than the appellants? Is that what you're saying? Yes, yes. And so— I agree with you. You're saying the legal issues presented in this case affect lots of different— Affects lots of different defendants, and it's not— If I may, I'm just very quickly very curious. How did your clients find out about the default judgment? I think until the point that the assets in the Amazon account was transferred either directly to plaintiffs, a police, or through other means. I see. In other words, once the default judgment was entered, Amazon started to accept— And just to rebut on one point, I think if it's document number 34, one attorney for one of the domestic defendants did appear before the motion for default was filed with the court. So that means there were— So the process was effectuated before the motion for default was filed with the court. And that, to one extent, shows that the defendants cannot act in concert and participate in—act in active concerted participation because otherwise everyone would be notified regarding the service issue. And plaintiff and a police very hard here alleged trademark infringement against three marks, not just one mark. And according to the evidence presented by plaintiff herself, it's very clear that no defendant infringed all three trademarks. So different defendants infringed on—allegedly infringed on different trademarks. So that also shows that there's no question of law or facts that are common to all defendants. And the second point I want to address— Well, the commonality would be that they infringed on a trademark of this plaintiff. Wouldn't that be common? You're saying there's no evidence that any single defendant infringed on all three trademarks, but they were all three trademarks of the plaintiff, right? Right. But I think Rule 20 requires at least— so to be a part of the same transaction requires a shared overlapping facts. So if they're not selling the same products and the alleged infringed trademarks are different, that kind of destroys the argument that those two groups of defendants are interconnected because they are targeting this one trademark holder. They don't even—they probably don't even know that the two trademarks were held by the same person. And the other point I want to address is whether or not— You don't have to know who holds a trademark to infringe on it. All you need to know is you don't hold a trademark and you're using it. You mean for— You don't have to know who holds it. What you need to know is if you don't hold it, it's not yours to use. That's right, yeah. All right. But the point here is if the products are different, it's hard to imagine that they work together to infringe on different trademarks. So that destroys the argument of—so that proves the joint is improper because there are different cause of action involved, although they are both—and there were cases that the court found allegations against multiple defendants, multiple but separate defendants of the acts—for the acts of infringing the same trademark with the same patents do not support a jointer under Rule 20, just simply because they are different defendants. Another point I'd like to address—I see the time coming up. May I finish the point? You may. It's related to the rule for F3, and that's related to a police argument that email service do not— it's not prohibited by the Hague Evidence Convention. Well, Hague Evidence Convention actually do not talk about the email service. So the email service is really decided by individual countries that are members to the Hague— not Evidence Convention—Hague Service Convention, to the Hague Service Convention. So that's decided by the domestic rules of each country. So China has a different set of rules, and the U.K. has a different set of rules. And in this case, at least, the Chinese authority does not allow email address— email service for any judicial or extrajudicial documents involving service or process. So that is—so on the rule—so on the Article 10 of the Hague Service Convention, whether or not— so the objection to Article 10 proves that the Chinese authority has limited means of receiving judicial or extrajudicial documents through international judicial assistance. That means that you have to proceed with the proper procedure that prescribed under the Hague Service Convention. And just to tag on that, compliance with the Hague Service Convention is mandatory, and that is recognized by the Supreme Court in all cases to which the convention applies. And the Hague Service Convention was designed to simplify and to standardize serving process abroad by using certain approved method of service and preempts the inconsistent method of service. So in other words, it was designed to make sure foreign defendants were properly served and to safeguard due process that are afforded to foreign defendants under the Constitution. Thank you, Counsel. Thank you, Your Honor. Well, we'll take this matter under advisement. This concludes those matters which are on today's docket for oral argument, and we are adjourned. Thank you.